IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-107-FL

| | | |
|---|---|---|
| JOHN MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTH CAROLINA GOLF AND | ) | ORDER |
| TRAVEL, INC.; SP FUTURES, LLC; | ) | |
| DENNIS WAYNE CYPHERS; and JAMEL | ) | |
| STUBBS, | ) | |
| | ) | |
| Defendants. | ) | |

This personal injury action is before the court upon several motions. These include plaintiff's motion to strike defendants' answers, or for an order imposing alternative sanctions for spoliation (DE 53). Plaintiff also seeks voluntarily to dismiss certain claims (DE 66). Defendants North Carolina Golf and Travel, Inc. ("NC Golf"), SP Futures, LLC ("SP Futures"), and Jamel Stubbs ("Stubbs") (collectively "defendants")[1] bring motions for partial summary judgment (DE 54), and for sanctions (DE 63) before the court. These motions are addressed below.

## STATEMENT OF THE CASE

Plaintiff asserts in amended complaint various tort based claims against defendants, alleged operators of an adult nightclub, Pure Gold, in Southern Pines, North Carolina, and their managers/employees. Plaintiff alleges he was lawfully present on Pure Gold premises July 30,

---

[1] As set forth in more detail herein, defendant Dennis Wayne Cyphers ("Cyphers") is appearing in this action pro se, and has not made any filings after his answer to the original complaint. All references to "defendants" herein, without qualification, are to the moving defendants specified in the text above.

2016, when defendant Stubbs, in the course of his employment as a bouncer for defendants, physically removed plaintiff from the premises, slamming him to the ground causing injuries. Plaintiff, proceeding on the basis of diversity jurisdiction, asserts claims for negligence, negligent hiring and supervision, assault and battery.

Following defendants' answers to the complaint and amended complaint,[2] a period of discovery was undertaken until October 30, 2019, and then extended to March 13, 2020, for the limited purpose of deposing a non-party witness, Daniel Lozano ("Lozano").

In his motion to strike defendants' answers or for an order imposing alternative sanctions for the spoliation of material evidence, plaintiff relies upon written discovery, depositions of plaintiff, defendant Stubbs, defendant Cyphers, and Tammy R. Russell ("Russell"), a corporate officer and part-owner of defendants NC Golf and SP Futures, and a document captioned "incident/investigation report".

Plaintiff's motion was met by defendants' one for partial summary judgment, wherein they rely upon certain written discovery and transcripts of the same depositions relied upon by plaintiff in support of his motion to strike, as well as testimony of non-party Lozano, and certain documentary evidence including the same document captioned "incident/investigation report" relied upon by plaintiff.

---

[2] Defendants NC Golf and SP Futures filed answer to original complaint on June 13, 2018. Defendant Cyphers, proceeding pro se, filed answer on August 20, 2018. Defendants filed answer to the amended complaint on December 13, 2018. Defendant Cyphers has not filed an answer to the amended complaint or made any further filings in this action after his response to the original complaint. On December 12, 2019, after discovery of issues with service to defendant Cyphers, the court allowed, but did not require, defendant Cyphers to file a response to the amended complaint. The court noted that its November 29, 2018, order allowing amendment of the complaint expressly provided that defendant Cyphers need not file a further response to the amended complaint, and that his original response shall stand in response to the amended complaint.

In his defense, plaintiff relies upon an opposing statement of material facts. In their defense of plaintiff's motion to strike, defendants rely upon declaration of Russell, plaintiff's initial disclosures, and an additional document captioned "incident/investigation report".

Defendants filed the instant motion for sanctions on May 29, 2020, relying upon correspondence between counsel, to which plaintiff responded in opposition, with reference to annual corporation reports of defendants NC Golf and SP Futures, as well as correspondence between counsel. That same date, plaintiff filed the instant motion voluntarily to dismiss his claim for negligent hiring and supervision, as well as all claims against defendant SP Futures, with prejudice.

## STATEMENT OF UNDISPUTED FACTS

Plaintiff is an individual who, at all relevant times, resided in New York, New York. (Defs' Stmt. of Facts ¶ 1). Defendant NC Golf is a registered North Carolina corporation that owns and operates Pure Gold. (Id. ¶ 2). Defendant SP Futures is a registered North Carolina limited liability company. (Id. ¶ 3; see Pl's Stmt. of Facts ¶ 3). Defendant Stubbs is an individual who, at all relevant times, resided in Southern Pines, North Carolina, "who was previously employed by [defendant NC Golf] at Pure Gold in a rotating capacity as a front door host, VIP host, and floating host." (Defs' Stmt. of Facts ¶¶ 4-5).

At the date and time relevant to this litigation, defendant Stubbs was working as a "door host." (Id. ¶ 6). "As a door host, [d]efendant Stubbs was responsible for greeting customers, verifying admissions, guiding wait staff, and ensuring compliance with club rules, among other duties," including "securing the door and watching people." (Id. ¶ 7; Pl's Stmt. of Facts ¶ 7).

Defendant Cyphers is an individual who, at all relevant times, resided in North Carolina and "was previously employed by [defendant NC Golf] at Pure Gold as a general manager." (Defs'

Stmt. of Facts ¶¶ 8-9). "As a general manager, [d]efendant Cyphers was responsible for exhibiting leadership skills, overseeing staff, marketing, and general operations at Pure Gold," as well as "overseeing all day-to-day operations, delegating responsibilities to bartenders and door hosts, budgeting, payroll, sales forecasting, . . . cash inside the building[,] . . . making sure the bank runs were taking care of, . . . all of the HR issues, complaints, hiring and firing." (Id. ¶ 10; Pl's Stmt. of Facts ¶ 10).

"In late July 2016, Plaintiff and a group of over one dozen friends visited Pinehurst, North Carolina to play golf." (Defs' Stmt. of Facts ¶ 11). "On July 29, 2016, the second or third day of their trip, . . . Lozano, Plaintiff's friend . . . was with him during the day and night," and accompanied plaintiff at a minimum to a restaurant prior to going to Pure Gold. (Id. ¶ 12; see Pl's Stmt. of Facts ¶ 12). "After midnight on July 30, 2016, . . . Plaintiff and a group of about seven to eight of his friends decided to go to Pure Gold," reasoning they "want[ed] to get a drink somewhere and [plaintiff didn't] think anything else was open so [they] chose a place that was open." (Defs' Stmt. of Facts ¶ 13; Pl's Stmt. of Facts ¶ 13).

"While Plaintiff testified that he entered Pure Gold, saw cigarettes on a table, and then lit a cigarette, all other witnesses, including Plaintiff's friend Daniel Lozano, testified that Plaintiff attempted to enter the club with a lit cigarette." (Defs' Stmt. of Facts ¶ 14; Pl's Stmt. of Facts ¶ 14). Plaintiff disputes the deposition testimony of others "to the extent that it conflicts with [p]laintiff's testimony." (Pl's Stmt. of Facts ¶ 14).

"Plaintiff's testimony conflicts with others as to a number of issues, including when he was informed to put his cigarette out." (Defs' Stmt. of Facts ¶ 15; Pl's Stmt. of Facts ¶ 15). After asking plaintiff to leave the club, defendant Stubbs ejected plaintiff from the club. (See id.). Plaintiff called the police after he was ejected from the club. (See id. ¶ 16). A police report created

after the police arrived states plaintiff "had been assaulted because he was smoking inside of the establishment," and that he was "'pushed through' the front door." (Id. ¶ 17). The police report also noted that plaintiff "was noticeably intoxicated, his speech was slurred, his eyes were glassy and he had a strong odor of alcohol coming from his person." (Id.).

"Plaintiff stated that he wanted to go to the hospital to have an x-ray performed," and "[p]laintiff was thereafter transported to Moore Regional Hospital by Moore County EMS." (Defs' Stmt. of Facts ¶ 18).

With respect to defendant Stubbs's background, plaintiff "has no evidence or personal knowledge that Defendant Stubbs has any history of violence or criminal record." (Id. ¶ 19). "Defendant Stubbs has never been arrested and, notwithstanding speeding tickets, has no criminal record." (Id. ¶ 20). "During his 11 years of employment at Pure Gold, [d]efendant Stubbs was never accused by any patrons of assault or any other wrongdoing." (Id. ¶ 21). "Defendant Stubbs' job description explicitly prohibited fighting, threatening violence, and improper conduct leading to damage of customer-owned property," and "[i]t also stressed safety, handling tasks with diplomacy, and avoiding decisions based on emotion." (Id. ¶ 22).

Additional facts pertinent to the instant motions will be discussed in the analysis herein.

## COURT'S DISCUSSION

The court turns its attention first to the motion to strike defendants' answers. For reasons noted, that motion, together with plaintiff's alternative request, fails. Consideration of the motion for partial summary judgment follows. With plaintiff's consent, defendants' motion is granted, as discussed below, in that part seeking dismissal of plaintiff's claim for negligent hiring, supervision, and retention. However, it is denied in that part where it seeks dismissal of plaintiff's negligence claim. Claims against defendant SP Futures all are dismissed, also as agreed by plaintiff.

5

Plaintiff's motion for voluntary dismissal is denied as moot. Defendants' request for sanctions is granted in part and denied in part, with the nature and amount of sanctions, if any, to be determined upon conclusion of the case.

A.    Motion to Strike

Plaintiff moves to strike defendants' answers as a sanction for spoliation of evidence comprising a security video recording of the premises on the night of the incident that is subject of the instant lawsuit (hereinafter the "video recording"). In the alternative, plaintiff requests that an adverse inference instruction be given to the jury regarding defendants' destruction of the video recording.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). "The imposition of a sanction (e.g., an adverse inference) for spoliation of evidence is an inherent power of federal courts— though one limited to that action necessary to redress conduct which abuses the judicial process." Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 449 (4th Cir. 2004).[3]

However, a sanction for spoliation "cannot be drawn merely from [a party's] negligent loss or destruction of evidence." Id. at 450. "[T]he conduct must be intentional," and "the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction." Turner v. United States, 736 F.3d 274, 282 (4th Cir. 2013).

In addition, a "party seeking sanctions based on the spoliation of evidence must establish, inter alia, that the alleged spoliator had a duty to preserve material evidence." Id. "The duty to

---

[3]       Internal citations and quotation marks are omitted from all citations unless otherwise specified.

preserve material evidence arises . . . during litigation" and it "extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Id. "Generally, it is the filing of a lawsuit that triggers the duty to preserve evidence." Id.

In this case, plaintiff is not entitled to striking of defendants' answer or other sanctions for spoliation for two independent reasons. First, plaintiff has not demonstrated that defendants had a duty to preserve the subject video recording before it was destroyed. Defendants maintained the video recording on a system that automatically deleted the data after a 30 day time period. (See Russell Decl. (DE 60-1) ¶¶ 4-5, 9). Plaintiff did not commence a lawsuit against defendants during that thirty day time period, and plaintiff did not make any demand upon defendants or threaten litigation or any legal action against defendants during that time period. (Id. ¶¶ 8-9). Instead, plaintiff's counsel sent a letter in anticipation of litigation "several months after the incident," at which point Russell, as officer of defendant NC Golf, "was incredibly surprised that [p]laintiff would contemplate such an action, particularly in light of [p]laintiff's disorderly and provocative conduct." (Id. ¶ 7; see Russell Dep. (DE 53-6) at 22).

Second, plaintiff has not demonstrated that defendants engaged in intentional destruction of the video recording. There is no evidence supporting an inference that defendants must have known that the evidence was relevant to some issue in any anticipated litigation, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction. Because the video recording was destroyed automatically after 30 days, (see Russell Decl. (DE 60-1) ¶ 5; Russell Dep. (DE 53-6) at 14, 16), there is no basis upon which to conclude that defendants willfully engaged in conduct to lose or destroy the video recording.

7

Plaintiff argues defendants had a duty to preserve the video recording that arose the same night the events took place because plaintiff called the police, and defendant Cyphers interacted with police on the night in question. The parties' interactions with police on the night in question, however, do not give rise to a reasonable inference that defendants' anticipated litigation by plaintiff starting on that night. Indeed, portions of the police report upon which plaintiff relies, which describe plaintiff's interactions with police, corroborate Russell's statement that she "was incredibly surprised that [p]laintiff would contemplate such an action, particularly in light of [p]laintiff's disorderly and provocative conduct." (Russell Decl. ¶ 7). For example, the narrative in the police report includes the following account of a meeting between police and plaintiff:

> [W]e met with the victim who was identified as John McCoy. He stated that he had been assaulted because he was smoking inside of the establishment. He stated that he was advised by a bouncer that he could not do that and then for no reason, he was "pushed through" the front door. Mr. McCoy was noticeably intoxicated, his speech was slurred, his eyes were glassy and he had a strong odor of alcohol coming from his person. He was not responding to questions that were asked and would not listen when being spoken to. The victim stated that the bouncer not only assaulted him but that he also damaged his cellular phone. He showed us both his cellular phone which had a small crack in the bottom left hand corner of the screen. He stated that he took a picture of the bouncer that assaulted him. He showed Sgt. Embler and myself the photo, which we recognized as Pure Gold employee, Jamel Stubbs. Moore County EMS arrived on the scene per the victim[']s request when he contacted Moore County 911. They began to check the victim[']s wrist per his request because he stated he thought it was broken. The victim was moving it around and stated that he wanted to go to the hospital to have an x-ray.

(DE 53-7 at 4) (emphasis added).

In addition, this police report provides individual defendants' account of the events:

> Both parties [Stubbs and Cyphers] advised that the victim had just come into the establishment with a group of males. He was smoking a cigarette and was advised that he could not do so inside of the establishment. He began waving the cigarette around and stating that he was not going to put it out. Management and security advised the victim that he was going to have to leave the establishment. He refused to do so. Management and security advised that the victim then lowered himself towards the ground like he was readying himself for a fight. Mr. Stubbs advised that he then pushed the victim out of the front door to which he lost his balance and fell back hitting the pavement. Mr. Stubbs stated that the victim[']s friends then

8

followed him outside. Mr. Stubbs then went back inside to continue on with his work. <u>The victim and his friends then tried to re-enter the establishment</u>. Another bouncer[] held the door so that they could not gain entry. <u>They continued pulling on the door until they made entry back into the establishment. Mr. Stubbs then pushed the victim back out of the front door. The victim continued stating that he was not leaving and pulled his cellular phone out to take pictures of Mr. Stubbs.</u> Mr. Stubbs then pushed the phone out of the victim[']s hand causing it to strike the ground. Mr. Stubbs then went back inside of the establishment and locked the doors so that the victim and his friends could not gain entry inside again.

(<u>Id.</u>) (emphasis added). The report states that defendant "Cyphers was able to show [the police officers] the video footage of the incident," and "[t]he video footage shows the list of events as" recounted by defendant Stubbs and defendant Cyphers. (<u>Id.</u>).

Because these accounts corroborate defendants' viewpoint on the night in question that plaintiff had been disorderly and in the wrong, plaintiff's interactions with police do not trigger an inference of "anticipated litigation" between plaintiff and defendants. <u>Turner</u>, 736 F.3d at 282. Moreover, where defendant Cyphers reviewed the video with police, and video was consistent with the accounts set forth in the police report, then there is no reasonable basis to infer a motive to destroy intentionally the video recording. Where the video automatically was deleted after 30 days, and where defendants had received no demand or notice from plaintiff, the court cannot conclude that defendants "willfully engaged in conduct resulting in the evidence's loss or destruction." <u>Id.</u>

Plaintiff suggests, nonetheless, that a duty to preserve, and an inference of willful destruction, arises from the statement in the police report that defendant Cyphers "was not able to burn a copy of the disk but <u>was advised to try and obtain a copy for court purposes</u>." (<u>Id.</u>) (emphasis added). The report also notes that plaintiff stated to police officers "that he was going to press charges on the suspect." (<u>Id.</u>). As an initial matter, however, advice by a police officer to make a copy of the evidence "for court purposes" does not give rise to a duty, in the instant civil litigation, to preserve the evidence. Such a statement is neither a commencement of civil litigation

9

nor an indication of anticipated civil litigation, particularly in light of the accounts in the reports, and Russell's view that plaintiff had engaged in disorderly and provocative conduct.

In addition, these statements in the police report do not give rise to an inference of intentional destruction of the video recordings, when considered in context with the totality of the foregoing circumstances. Additional factors bearing on this determination are that the police report marked the video recordings as "seized" (DE 53-7 at 1), and that police officers attempted to contact plaintiff on August 6, 2016, but he did not return the call. (Id. at 6). The officers therefore "request[ed] that this case be closed due to the victim failing to cooperate by obtaining warrants." (Id.). In other words, plaintiff made no contact with defendants or police after the night of the incident, and before the video was automatically deleted.

Furthermore, Russell testified that she first received a copy of the police report after she received a letter from plaintiff's counsel. (Russell Dep. (DE 53-6) at 15). At the time of the incident with plaintiff, Russell "thought there was no injury . . . and did not think there was going to be any further need for the video." (Id. at 21). She "thought he was the party in the wrong," and "never thought he would be the one suing [defendants]." (Id. at 22). Likewise, when she first reviewed the police report, she thought the reference to "seized" meant that the police had in their possession the video of the incident. (Id. at 15-16). Only upon further inquiry to police was she informed that the police "went and looked in their evidence," and "they just had a note that [defendants] had the video footage." (Id. at 14).

In sum, in light of all the circumstances defendants did not have a duty to preserve the video recording prior to receiving a letter from plaintiff's counsel in anticipation of civil litigation. In addition, and in the alternative, defendants did not engage in intentional conduct in destroying

10

the video recording. Therefore, sanctions for spoliation are not warranted, and plaintiff's motion to strike, and in the alternative for sanctions, must be denied.

B.  Motion for Partial Summary Judgment

1.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary

11

judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

     2.     Analysis

          a.     SP Futures and Negligent Hiring, Supervision, and Retention Claim

Defendants move for summary judgment on plaintiff's claims against defendant SP Futures, and on plaintiff's claim for negligent hiring, supervision, and retention. As to both, plaintiff does not oppose summary judgment.

Where the undisputed facts demonstrate that SP Futures is not an entity involved in the ownership or operation of Pure Gold, and it did not employ or direct the work of either individual defendant, (see Defs' Stmt. of Facts (DE 56) ¶ 3), there is no genuine issue of material fact as to the liability of defendant SP Futures. Accordingly, defendants' motion for summary judgment is granted in that part pertaining to all claims asserted against defendant SP Futures. All of plaintiff's claims against defendant SP Futures are dismissed with prejudice.

To establish a claim of negligent hiring, supervision, and retention, a plaintiff must show an "employer's hiring or retention after actual or constructive knowledge of [an] employee's incompetence," or "unfitness or bad habits." Medlin v. Bass, 327 N.C. 587, 591(1990). Here, plaintiff has not brought forth any evidence of any prior incompetence, unfitness, or bad habits, on the part of defendant Stubbs, such as would establish actual or constructive knowledge of the same on the part of defendant NC Golf or Cyphers. Indeed, it is undisputed that plaintiff "has no evidence or personal knowledge that Defendant Stubbs has any history of violence or criminal record." (Defs' Stmt. of Facts (DE 56) ¶ 19). "Defendant Stubbs has never been arrested and, notwithstanding speeding tickets, has no criminal record." (Id. ¶ 20). And, "[d]uring his 11 years of employment at Pure Gold, [d]efendant Stubbs was never accused by any patrons of assault or any other wrongdoing." (Id. ¶ 21).

Therefore, plaintiff's claim for negligent hiring, supervision, and retention fails as a matter of law and is dismissed with prejudice. Defendants' motion for summary judgment is granted in that part seeking dismissal of plaintiff's claim for negligent hiring, supervision, and retention.

> b. Negligence Claim

Defendants argue that plaintiff's negligence claim must be dismissed, because it is based on the same intentional conduct that forms the basis for plaintiff's assault and battery claims.[4] For the following reasons, the court disagrees and denies defendants' motion for summary judgment in this part.

The North Carolina Supreme Court has observed that "[w]hile the courts . . . are not in agreement as to the various acts and omissions which may be included in the term 'negligence,' there is, however, general agreement that an intentional act of violence is not a negligent act."

---

[4] Defendants do not seek summary judgment on plaintiffs' assault and battery claims.

<u>Jenkins v. N. Carolina Dep't of Motor Vehicles</u>, 244 N.C. 560, 563 (1956). The court further explained this distinction as follows:

> At common law, actions for trespass and trespass on the case provided remedies for different types of injuries: The former 'for forcible, direct injuries, whether to persons or property,' and the latter 'for wrongful conduct resulting in injuries which were not forcible and not direct.' <u>In the former, the injury was intended</u>. <u>In the latter, injury was not intended but resulted from the careless or unlawful act</u>. Negligence, in all its various shades of meaning, is an outgrowth of the action of trespass on the case and does not include intentional acts of violence. For example, an automobile driver operates his car in violation of the speed law and in so doing inflicts injury as a proximate result, his liability is based on his negligent conduct. On the other hand, if the driver intentionally runs over a person it makes no difference whether the speed is excessive or not, the driver is guilty of an assault and if death results, of manslaughter or murder. <u>If injury was intended</u> it makes no difference whether the weapon used was an automobile or a pistol. Such willful conduct is beyond and outside the realm of negligence.

<u>Id.</u> (emphasis added; citations omitted).

In <u>Pleasant v. Johnson</u>, 312 N.C. 710, 714 (1985), the court further explained the distinction between negligence and intentional torts, in a manner pertinent to the instant case. There, the court noted that "[t]he concept of willful, reckless and wanton negligence inhabits a twilight zone which exists somewhere between ordinary negligence and intentional injury." <u>Id.</u> "The state of mind of the perpetrator of such conduct lies within the penumbra of what has been referred to as 'quasi intent.'" <u>Id.</u> The court further noted that, in the case of "willful negligence," the "breach of duty may be willful while the resulting injury is still negligent." <u>Id.</u> Importantly for the instant case, "[o]nly when the injury is intentional does the concept of negligence cease to play a part." <u>Id.</u> (emphasis added); <u>see Britt v. Hayes</u>, 142 N.C. App. 190, 193 (2001) (stating that the "willful and deliberate purpose not to discharge a duty differs crucially from the willful and deliberate purpose to inflict injury—the latter amounting to an intentional tort") (quotations omitted).

Accordingly, in cases in which there is a dispute of fact as to whether an injury was intentional, on the one hand, or whether the conduct was intentional and resulted in injury, on the

14

other hand, it is appropriate to present both a claim of negligence and a claim of intentional tort to the jury. For example, this court previously has observed that "[t]o the extent that plaintiff is arguing that he may be able to pursue claims of negligence and intentional torts based on [a] Defendant['s] actions, the court agrees," while recognizing that ultimate recovery can be based only on one or the other theory of liability. Morgan v. Spivey, No. 5:16-CV-365-FL, 2017 WL 4399539, at *10 n. 10 (E.D.N.C. Sept. 29, 2017).

Consistent with this approach, in State ex rel. Williams v. Dowdy, 248 N.C. 683 (1958), the North Carolina Supreme Court upheld part of a jury charge that asked whether the plaintiff was "willfully and maliciously assaulted and injured by the defendant" and, separately, whether the plaintiff was "injured by the negligence of the defendant," in a case where the defendant was alleged to have fired a gun either into the ground or in the direction of a crowd of people. Id. at 685-687; see, e.g., Britt, 142 N.C. App. at 194 (holding it was up to jury "to determine whether defendant intended to injure the plaintiff," where defendant intentionally backed his truck into plaintiff's vehicle at a slow speed); Lynn v. Burnette, 138 N.C. App. 435, 442 (2000) (recognizing that "[t]here are situations where the evidence presented raises questions of both assault and battery and negligence," and allowing negligence claim to proceed where a defendant "intended to shoot at the tire on plaintiff's vehicle but pulled the trigger before she had properly aimed, causing the bullet to strike plaintiff"); Vernon v. Barrow, 95 N.C. App. 642, 643 (1989) (same, allowing negligence claim to proceed, while assault claim was time barred, where plaintiff intentionally fired a shot into the floor of a lounge near the plaintiff's feet).

In this case, there is a genuine dispute of fact as to whether defendant Stubbs intended to cause injury to plaintiff, on the one hand, or whether he engaged in conduct that was intentional and resulted in injury, on the other hand. Accordingly, it is appropriate to present both a claim of

15

negligence and claims of intentional torts of assault and battery to the jury. It is premature to dismiss as a matter of law plaintiff's negligence claim where the jury may find that defendant Stubbs had no intention (actual or constructive) to cause injury to plaintiff, but that he acted in such a manner that breached a duty of care to plaintiff. Because "[o]nly when the injury is intentional does the concept of negligence cease to play a part," Pleasant, 312 N.C. at 714, plaintiff's negligence claim must be allowed to proceed.

Defendant argues, nonetheless, that plaintiff makes only "conclusory allegations of negligence" in the complaint, citing plaintiff's assertion that defendant Stubbs "negligently, recklessly, willfully, and wantonly removed the Plaintiff from the premises in such a violent manner which included, but was not limited to lifting the Plaintiff and slamming him into the ground, so as to cause serious physical injury and property damage." (Def's Mem. (DE 57) at 9; Compl. ¶ 17). This argument misses the mark for two reasons. First, the quoted allegation describes conduct that reasonably could permit an inference of either an intent to cause injury, supporting a claim of intentional tort, or instead intentional conduct that is undertaken in such a manner that results in plaintiff's injury, supporting an alternative claim of negligence. See Pleasant, 312 N.C. at 714 (noting that, in the case of "willful negligence," the "breach of duty may be willful while the resulting injury is still negligent"); Britt, 142 N.C. App. at 193 (distinguishing "willful and deliberate purpose not to discharge a duty" from "willful and deliberate purpose to inflict injury—the latter amounting to an intentional tort").

Second, the evidence in the record permits competing inferences regarding whether defendant Stubbs intended to cause injury, or engaged in intentional actions that breached a duty of care, or neither. According to plaintiff's account of events:

> [Defendant Stubbs] escorted me out and slammed me in this door three times and I said if you move to the left we can get out of here a little easier and as soon as he

16

pushed me then he slammed me down on the ground . . . . After I got outside, that's when he slammed me down to the ground and I thought he was going to attack Daniel so I took a picture. He snatched my hand, flipped me over, took my phone from me.

(Pl's Dep. 32-33). According to another account attributed to plaintiff, in the police report of the incident, "he was smoking inside of the establishment . . . . he was advised by a bouncer that he could not do that and then for no reason, he was 'pushed through' the front door." (DE 56-9 at 3). According to an account attributed to defendants and video footage of the incident, also in the police report, "Mr. Stubbs advised that he . . . pushed the victim out of the front door to which he lost his balance and fell back hitting the pavement. . . . The victim and his friends then tried to re-enter," and "Mr. Stubbs then pushed the victim back out the front door." (Id.). Accordingly, allegations in the complaint and the evidence in the record permit inferences in favor of plaintiff supporting either a claim of negligence or intentional tort.

Defendants rely on two unpublished district court cases, Arch Specialty Ins. Co. v. Hedrick, No. 1:13CV621, 2014 WL 6627039 (M.D.N.C. Nov. 21, 2014), Great Divide Ins. Co. v. Midnight Rodeo, Inc., No. 5:08-CV-204-F, 2010 WL 2077162, at *1 (E.D.N.C. May 24, 2010), for the proposition that plaintiff must rely upon assault and battery claims exclusive to any claims of negligence, in circumstances analogous to that here where a plaintiff is removed forcibly from a bar by a bouncer. These cases, however, are inapposite. Critically, they both involved declaratory judgment actions by an insurance company, seeking to enforce a policy endorsement limiting the amount that the insurance company could be required to pay under the policy for damages "arising out of" an assault or battery. Arch Specialty, 2014 WL 6627039 at *2; see Great Divide, 2010 WL 2077162 at *3. The courts' analysis thus turned on application of that "arising out of" contractual language, see Arch Specialty, 2014 WL 6627039 at *5-6; see Great Divide, 2010 WL 2077162 at *5-6, whereas the issue in the instant case is whether plaintiff may present to the jury

alternative common law claims. Based on application of the contractual language, the courts viewed the inquiry as conduct arising out of an assault and battery to the exclusion of negligence. See id. By contrast, in the instant case, the court follows the rule stated by the North Carolina Supreme Court that "[o]nly when the injury is intentional does the concept of negligence cease to play a part." Pleasant, 312 N.C. at 714.

Defendants also rely upon Arch Specialty for the proposition that "[i]t is hornbook law that the intent which is an essential element of the action for battery is the intent to make contact, not to do injury." (Reply (DE 61) at 7 (quoting Arch Specialty, 2014 WL 6627039 at *7)). Notably, Arch Specialty does not rely upon a North Carolina Supreme Court case for this statement of law, but rather quotes from an opinion by the United States Court of Appeals for the Second Circuit, United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 354 (2d Cir. 1993), in another declaratory judgment insurance case. Moreover, that statement of law conflicts with the directions by the North Carolina Supreme Court to distinguish between instances when "the injury was intended," and when the "injury was not intended but resulted from the careless or unlawful act." Jenkins, 244 N.C. at 563 Thus, far from irrelevant, the intent to do injury is critical to distinguishing a battery from negligence, and a finding of intent to do injury is necessary to exclude negligence as a basis for recovery. See id.; see Pleasant, 312 N.C. at 714.

Defendants also rely upon a number of district court cases and an unpublished court of appeals case dismissing negligence claims where intentional tort claims are alleged. These cases, however, address pleading deficiencies where the factual allegations do not describe negligent conduct. By contrast, the factual allegations in this case permit the inference of either intentional torts or negligence, as set forth above. In any event, the court here is not addressing a motion to dismiss based upon pleading deficiencies, but rather a motion for summary judgment, where

evidence in the record also permits an inference of either intentional torts or negligence. Furthermore, a number of the cases cited concern distinguishable harassment or discrimination in an employment context. <u>See, e.g.</u>, <u>Mitchell v. Lydall, Inc.</u>, No. 93-1374, 1994 WL 38703127 * 3 (4th Cir. Feb. 10, 1994) (failure to accommodate and discharge); <u>Baldwin v. Tradesmen Int'l, Inc.</u>, No. 5:12-CV-00116-FL, 2013 WL 1192314, at *1 (E.D.N.C. Mar. 22, 2013) (same-sex sexual harassment and retaliation); <u>Bratcher v. Pharm. Prod. Dev., Inc.</u>, 545 F. Supp. 2d 533, 536 (E.D.N.C. 2008) (employment discrimination on the basis of age, race, and sex, and retaliation).

In sum, defendants have not demonstrated that plaintiff's negligence claim fails as a matter of law. Therefore, defendants' motion for summary judgment in that part where it seeks dismissal of plaintiff's negligence claim is denied.

C.     Motion for Voluntary Dismissal

Plaintiffs seeks to dismiss voluntarily his claims against defendant SP Futures as well as his negligent hiring, retention, and supervision, claim. A "plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves . . . a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A). Otherwise, "an action may be dismissed at the plaintiff's request only by court order, on the terms that the court considers proper." Fed. R. Civ. P. 41(a)(1)(B). Here, where the court has granted summary judgment to defendants on the same claims that plaintiff now seeks to dismiss voluntarily, the court denies as moot plaintiff's motion for voluntary dismissal.

D.     Defendants' Motion for Sanctions

Defendants seek sanctions under Rule 11 for plaintiff's assertion of claims against defendant SP Futures as well as his claim for negligent hiring, retention, and supervision, based upon allegations in the complaint that defendant Stubbs had a prior criminal record.

19

By filing a complaint, "an attorney . . . certifies," in pertinent part, "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Id.

"For the purposes of Rule 11, the factual inquiry necessary to file a complaint is generally satisfied if all of the information which can be obtained prior to suit supports the allegations made, even though further facts must be obtained through discovery to finally prove the claim." In re Kunstler, 914 F.2d 505, 516 (4th Cir. 1990). "However, a complaint containing allegations unsupported by any information obtained prior to filing, or allegations based on information which minimal factual inquiry would disprove, will subject the author to sanctions." Id.

"To be reasonable, the prefiling factual investigation must uncover some information to support the allegations in the complaint." Brubaker v. City of Richmond, 943 F.2d 1363, 1373 (4th Cir. 1991). "While a lawyer may rely on discovery to reveal additional facts to support claims which are well grounded in fact, Rule 11 sanctions are appropriate when a lawyer attempts to use

discovery to support . . . frivolous claims for which there is no factual support." <u>Kunstler</u>, 914 F.2d at 515. Upon appropriate motion, the court must consider whether Rule 11 has been violated on a claim by claim basis. <u>Brubaker</u>, 943 F.2d at 1374.

Here, plaintiff's allegations asserted in support of his claim for negligent hiring, retention, and supervision, were unsupported by any information obtained prior to filing. Plaintiff alleges in the complaint that defendants "failed to run a criminal background check, which would have revealed that [defendant Stubbs] had a propensity for violence due to his prior criminal convictions" (Compl. ¶ 34), and that defendants knew or should have known of defendant Stubbs's "propensity for violence based on prior instances of violent conduct." (<u>Id.</u> ¶ 37). It is undisputed that defendant Stubbs had no prior criminal convictions, or prior instances of violent conduct. Further, plaintiff brings forth no information obtained before filing of the complaint "to support [these] allegations in the complaint." <u>Brubaker</u>, 943 F.2d at 1373. In opposing sanctions, plaintiff cites no information obtained by counsel prior to filing of the complaint tending to show defendant Stubbs had prior criminal convictions or prior violent conduct. (Pl's Opp. (DE 65) at 2).

Plaintiff suggests that defendant Stubbs's alleged conduct in the incident in question is enough, in itself, to justify an assertion of prior criminal convictions or prior instances of violent conduct. This suggestion is unavailing. Defendant Stubbs's present alleged conduct is not evidence in itself of his prior conduct. There are no facts alleged, nor is there any information identified by plaintiff, pertaining to any prior conduct by defendant Stubbs. Thus, plaintiff lacked even "some information to support [these] allegations in the complaint." <u>Brubaker</u>, 943 F.2d at 1373.

Moreover, plaintiff's allegation that defendant Stubbs had "prior criminal convictions" that would have been revealed had defendants "run a criminal background check" (Compl. ¶ 34), is

particularly egregious, given that there is no suggestion that plaintiff's counsel himself even ran a criminal conviction check on defendant Stubbs, which convictions would be a matter of public record. Accordingly, such allegations "unsupported by any information obtained prior to filing," and "based on information which minimal factual inquiry would disprove, will subject the author to sanctions." Kunstler, 914 F.2d at 516.

In contrast, the court finds no Rule 11 violation based upon claims asserted against defendant SP Futures. At the time of the filing of the complaint, plaintiff's counsel had information upon which to believe that SP Futures was involved in the ownership/operation of Pure Gold on the night of the incident in question. In particular, North Carolina Department of State annual reports reveal that SP Futures and NC Golf shared corporate officers, and maintained the same principal office and mailing address. (Pl's Opp. Ex. 1 (DE 65-1)). While defendants now have demonstrated that there is no genuine issue of fact as to lack of ownership or operation of Pure Gold by SP Futures, this pre-filing information was sufficient to support inclusion of SP Futures as a defendant in the instant complaint. Accordingly, sanctions shall not be based on plaintiff's inclusion of defendant SP Futures in the case.

Having determined that sanctions are warranted, in part, based upon plaintiff's assertion of his negligent hiring, retention, and supervision claim, it remains for the court to determine the nature and extent of sanctions. "In calculating the sanction, a district court should bear in mind that the purposes of Rule 11 include compensating the victims of the rule 11 violation, as well as punishing present litigation abuse, streamlining court dockets and facilitating court management." Brubaker, 943 F.2d at 1373-1374 (quotations omitted). "The amount of a monetary sanction, however, should always reflect the primary purpose of Rule 11—deterrence of future litigation abuse." Id. at 1374. "Accordingly, a district court should expressly consider the four factors

22

adopted by this circuit in In re Kuntsler: "(1) the reasonableness of the opposing party's attorney's fees; (2) the minimum to deter; (3) the ability to pay; and (4) factors related to the severity of the Rule 11 violation.'" Id. (citing In re Kuntsler, 914 F.2d at 523). Such other factors include "the offending party's history, experience, and ability, the severity of the violation, the degree to which malice or bad faith contributed to the violation, the risk of chilling the type of litigation involved, and other factors as deemed appropriate in individual circumstances." In re Kuntsler, 914 F.2d at 524-525.

In this case, the court does not yet have sufficient information to make a final determination of the nature and amount of sanctions, if any, to be awarded. At this juncture, the court grants in part and denies in part defendants' motion for sanctions, based upon a Rule 11 violation due to plaintiff's ill-advised assertion of a claim for negligent hiring, retention, and supervision, but not for assertion of claims against SP Futures. The court leaves for determination upon conclusion of the case the nature and amount of sanctions, if any, to be awarded. It is incumbent upon defendants to return to the court's attention that topic in motion to be filed after all proceedings on the merits are complete. Defendants' motion may address at that time the factors bearing upon the nature and amount of sanctions, if any, including a statement of attorney's fees solely attributable to plaintiff's assertion of his negligent hiring, retention, and supervision claim. Plaintiff may file a response thereto providing information also bearing on the pertinent factors, including but not limited to plaintiff's counsel's ability to pay any amount of reasonable attorney's fees asserted by defendants. Plaintiff need not repeat, and may incorporate by reference, arguments already made in opposing the instant motion on the basis that he has acted in good faith. (See Pl's Opp. (DE 65) at 3-8). The court will take into account such arguments in considering the nature and amount of sanctions under Kunstler, 914 F.2d at 524.

In sum, defendants' motion for sanctions is granted in part and denied in part, with the nature and amount of sanctions, if any, to be determined upon conclusion of the case.

E.      Scheduling for Trial and Other Case Activities

Where claims remain for trial, in accordance with case management order entered August 6, 2018, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial.  The parties are DIRECTED to confer and file within 21 days from the date of this order a joint status report informing of 1) estimated trial length; 2)  particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates.  In addition, although the parties already engaged in mediation in September 2019, now in light of further case activities, the parties shall specify if they wish to schedule a court-hosted settlement conference or time for additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such.

## CONCLUSION

Based on the foregoing, plaintiff's motion to strike or for sanctions (DE 53) is DENIED. Defendants' motion for partial summary judgment (DE 54) is GRANTED IN PART and DENIED IN PART as set forth herein.  Plaintiff's claims for negligence, assault, and battery, may proceed against all defendants except for defendant SP Futures.  Plaintiff's claim for negligent hiring, retention, and supervision, and all claims against defendant SP Futures are DISMISSED WITH PREJUDICE.  Plaintiff's motion to voluntarily dismiss (DE 66) is DENIED AS MOOT. Defendants' motion for sanctions (DE 63) is GRANTED IN PART and DENIED IN PART with the nature and amount of sanctions to be determined upon conclusion of the case, as detailed herein.   The parties are DIRECTED to file within 21 days of the date of this order a joint status report regarding trial and other case activities, as set forth herein.

24

SO ORDERED, this the 24th day of August, 2020.

LOUISE W. FLANAGAN
United States District Judge